Good morning, Assistant State Attorney Peter Maltese on behalf of the people. Alright, before we proceed, Mr. Maltese, why don't you step back up here for a moment. Each of you will have approximately 15 minutes to present oral arguments. And, Mr. Ambrose and Matt, you may take some time for rebuttal. Plus, there are two motions that we received recently. One is a motion to cite additional authority, which we would allow, and if Mr. Maltese wants some time to respond, it's the Burns case? No objection. Alright, and then there's also, you have a motion to withdraw the advancement argument, can you agree? Correct. Which would be allowed. Alright, so then we can proceed. Good morning, Your Honors. My name is Heidi Ann Ambrose from the State Appellant's Offender, representing Appellant Michael Murphy. This case simply boils down to the question of whether or not, because of the Second Amendment, Heller and Aguilar, whether the police can have probable cause based on the mere possession of a gun in a citizen's home. In this case, Officer Eliza saw my client, in a mild argument with a woman, flash, looked at the shirt, and flashed the bed of a gun. After that, my client went inside, the woman left with no incident. Because of this mere flash of a gun, the officer radioed his enforcement team and said there's a black man with a white t-shirt with a gun somewhere in the building at 1222 South Central Park Avenue. Well, this prompted a minute later, four armed police officers, at 10 o'clock at night, with flashlights out, storming into this building, pointing the gun at my client, who thankfully, for the safety of everyone in the room, discarded the weapon on the floor where he was arrested, charged, convicted of armed habitual criminal, and sentenced to 17 years in prison. Could I interrupt you? Now, there's a big debate here about facts. I think you said in your brief there's no dispute about the facts, but then the state suggests that there is a debate about the facts. Your brief suggests that the police officers went in first, and then retrieved the gun. The state indicates that the officers testified at the hearing on the motion to suppress, that when they were in this vestibule area, the door was open, and the officers had guns drawn and a flashlight into the apartment, observed the defendant remove a gun from his waistband, either place it or toss it on the floor, and then they entered and recovered the gun. I think that this dispute is essentially a red herring. I read the testimony of the officers at trial as they entered, as the client was dropping the gun. I don't think it absolutely matters. I don't think the police officers had any right to walk into the apartment, regardless of when my client disposed of the gun. In fact, when he disposed of it, it was really a critical to the trial court's odd plain view argument, which is that because my client, with guns drawn at him, decided to be safe and not be shot, and drop his gun on the floor, the officers at that point had the ability to come into his house and seize the gun and make the sentencing. So his finding was based on his interpretation of the plain view doctrine, wasn't it? Yes. All right. Now, do you have any agreement or disagreement with his idea that plain view consists of approximately three elements, but it doesn't have to be tied to incident circumstances? No, I don't. I believe that plain view offers a basis for probable cause. Probable cause plus incident circumstances to enter the home, or probable cause to get a warrant to enter the home. But it requires a couple of things. One, the item has to be immediately apparent to the contraband. And if we follow Heller and Aguilar and the Second Amendment, a gun in someone's home is not contraband. And the state can see to that point. Did the court reject that argument at the trial judge? Yes. The court made an argument post-Aguilar that although a gun in the home is not per se a constitutional violation, the police are entitled, and this is something, to enter a citizen's home to determine whether or not that person has a code card or is a felon. So essentially, they're allowed to turnstock you whenever they see you in your home with a gun and ask you these questions, arrest you, throw you in the floor, just to make sure that you are or are not a felon, which is obvious contrary to the Second Amendment. It seems kind of unusual to me, but neither one of you cited any cases that kind of were factually similar, where police were in a hallway or, you know, at a location, observed a crime occur or some possible crime occur, entered a home, observed contraband. There's a number of First District cases on guns and drugs. Neither one of you discussed them at all. And, I mean, are you aware of any First District cases where the police were at a location? I mean, did you mention, maybe you mentioned Hassan in your brief. Did you? Yes, I did. Okay. Yeah, I'm sorry, Your Honor. I believe that I fully briefed it in the opening brief. Maybe Hassan is in there, but there's some other cases. You know, there's like People v. Allen, which involved the seizure of a gun. People v. Garcia, which involved marijuana or a controlled substance and a gun. Hassan was a controlled substance. Perrini was a controlled substance case. So, I'm just curious. Neither one of you actually talked about situations where the police were in a location and saw something from a hallway area. I believe the reason for that is I don't agree that the police should have been in a hallway area to begin with. Because of the angle of it. Right. And also because of the angle of it, a gun is not contraband. A gun in a home is not contraband. What about what happened on the fence? What was that? Well. What is that? The state would like to call this home. The state would like to say, and the state argued in the trial court, that the flashes of the gun in the argument with the woman, the woman that they never contacted, the woman that never stopped, the woman who never called 911, the woman who never screamed for help, that that provided them with enough probable cause to enter the home. Well, let's just talk about what was actually observed on the fence. There was a discussion or some testimony that the defendant and another woman were coming out of the building. There was shouting and argument. Yes. And then he was observed actually lifting up his shirt and showing a handgun. Yes. All right. Now, you're saying that that doesn't suggest any criminal activity because of Aguilar? Well, number one, as a trial court found, we don't know if the woman saw the gun. She was walking down the stairs and her back was seen. Number two, it's the right to keep and bear arms. I am allowed to show my gun in my home. I'm not talking about in the home right now. I'm talking about out on the steps. Are you allowed to show your weapon to an individual you're maybe arguing with? Is that not considered an aggravated assault? I think it could be an aggravated assault if you can prove, number one, that the person was in fear of the person. This person could have been an intruder, which is essentially what my client argued and said when he was at trial. If I'm flashing my gun at someone who broke into my home, that is constitutionally protected conduct. My client has a right to have a gun in his home. Is it your position then that this really was just nothing and the police should kind of just not do anything? My position is that that was kind of a late stage, which the state's allowed to make argument, that the woman was not in fear, but the police's conduct in not even stopping the woman and asking her, Hey, are you okay? Do you need anything? Didn't show that the police even acted like it was an assault. The radio call said nothing about a woman. The entry officer, Oliveras, didn't know about a woman. He thought that there was just a man with a gun. That's it. He didn't know about her, about what had happened on the street. Don't we always take into account the information available to every single person, every officer on the scene? Yes, and the officer who radioed didn't say there was an assault happening, or that we assaulted him. And we know what he testified to subsequently. Yes. Regardless of whether that's probable cause, that's certainly not actual circumstances. This is a Class C misdemeanor that they're investigating. It's hardly a grave crime. No one was injured. But doesn't the U.S. Supreme Court consider assault a grave crime? When there's violence involved. I think robbery, assault. When there's violence involved, and there was no violence involved here. And because of Aguilar, we can't just presume that someone who's armed is necessarily dangerous. The conduct that he was exhibiting could potentially have been a defense of his home. It could have been a possible beginning of a domestic battery. It could have been an aggravated assault. You know, I don't know that Aguilar actually protects people from branching guns on a street. I really don't. We know he was treating them from home. Yes. Right, which is part of his home. You know, just like you said, they didn't know whether she was being threatened. They don't know if it's his home or not. They couldn't have asked her. I mean, there was no, again, even if we, which I'm not conceding that this was an assault, even if we show that, they still have to have actual circumstances. This is a home that had bubblers that had a door. They still have to, this is near the lock of the door. Now, he didn't even know that they were there. I mean, he didn't know he was being watched. So this is not a case where he's going to flee. And the woman had left, so the danger to her was gone. Are you saying the police couldn't open that door? The police could not have opened that door. Yes. You mean the second? The first door, the one outside. Yes. And what case would you cite for that? I would cite Burns and Jardim. Yes. I think Burns kind of affirmed that we don't limit protections to single-family homes. This is a single-family home. Wouldn't the Supreme Court in Jardim specifically say that the police can open a door, that when there's someone, there's a certain amount of license, that, you know, like little Girl Scouts selling cookies. Right. And in this case, was there any testimony that that door was locked? Well, what the court in Jardim has said is that when you have a door that has locks above them, it's an invitation for the public to come, to knock, and if you get no response, to leave. And that's not what the police did here. They didn't even try to knock. They just automatically opened the door. You mean the outer door? The outer door. Which entered into the vestibule, which entered into essentially the front area of my client's house. Isn't Jardim and Burns, aren't those cases about the notion that the police cannot take dogs, sniff around the door, then go get a search warrant and recover narcotics in a home? This is even worse. I mean, this is even worse. Would you say that's an accurate summary of those cases? I think that's an accurate summary of the facts, but they're not limited. They kind of fall in line with all of the first district cases that don't allow officers to go knocking on doors to try to buy drugs. It does, but what we have here is even worse conduct than having a dog sniff around the door. I mean, this is not the case that they opened the door, they saw him at the door, and then they said, oh, we're going to close this door and get a warrant. This is the case that they just barged right in. They didn't even try to barge. Barged right in where? The front door of the home, of a single-family two-flat. That's it. Where are we getting that testimony from? The officer said the door was open, they just twisted the knob, went in, and they entered a vestibule area. I think that when I have my phones on and I have flashlights out and I'm yelling police and I'm a citizen in my home, I'm going to be pretty scared and say that's barging. Yes, but I'm talking about the outside entry. They twisted the knob. I'm reviewing what was in the record. They twisted the knob and entered a vestibule. Right. The testimony was that when they entered the vestibule, a door was open. Yes. And they put a flashlight into the door, said police, and they had their guns drawn. Yes. Now, is a flashlight a search? A flashlight can be a seizure. I mean, can I be sure about that one? What case would you say? Could I talk about just the beginning of that? I mean, I'm not aware of any case. In fact, I'm aware of several cases that say that flashing a flashlight is not a seizure and it's not a search. Well, that would go to the state of consciousness of the officer. Do you know about why he dropped the gun? He dropped the gun because there were four armed Chicago police officers pointing a gun at him and he's not going to get shot and he's not going to put everybody else in the building in danger, so he drops the gun. I'm not really sure what else he could have done. So in the moment that police are coming at me, I'm going to throw out my gun because I know that that's going to make everyone else safe because I don't want to be shot. But as far as the front door, just like Burns says, and Burns is a 16-unit building. This is a two-flat, a classic Chicago two-flat. It looks in all characteristics a lot like a single-family home. And the fact that the door is not locked doesn't limit. Burns didn't have to go there, right, because the door was locked. But there was access. The police gained access to the unit in Burns by a stranger coming out, a resident. We don't even know who it was, a resident, opening the door for police, and the police gained access. Even though that happened, the Supreme Court didn't say, oh, that's fine. You were lawfully where you should have been. They still said, because the residents indicated they wanted privacy, just like in this building. Was there anything in the record, or was there any evidence at trial, that the tenant or tenants in this building took any additional steps to secure the vestibule door? The vestibule had other. It had a peephole. It had the names and the size, which I think is sufficient. I don't know how the door became locked. I don't even think it's relevant. This is a minute. This is not hours and hours. I don't even know if that's why it unlocked the door. But to say that you can twist, you can open it, and if you're lucky enough as a police officer to gain access to that building, then I'll bust it off. You can search wherever you want to. It would mean every home that unlocks it. I unlocked my door. You know, open to the police just coming into the building. This isn't like, let's say, Highlights, where there's a revolving door, where there's a lobby and there's a Starbucks, and when you're a doorman, you can't get past the doorman. This was the hour door that prevented people from coming in. I'm not really sure how much clearer. To use this on a lock or a not lock, the Supreme Court didn't need to make that distinction because it was locked when the police tried it. But they also said that if a person lets you in, that's fine. What do you understand the elements of a plain view to be? That the police have to be where they're supposed to be, where they're allowed to be. What else? It's not that. It has to be contraband. And you have to be in the lock when you see it, yes. And I don't think it just relied on the fact that it's not contraband. If they were not... Even if they were locked in the rest of the door, which I'm not conceding. You still can't walk fully across the threshold into a home. You don't have a lock to get in there, and you don't have engine circuits to get it in there. Especially when you drop it down the floor. Let me stop you there. If we were to assume that they could lawfully enter the vestibule, and they had probable cause. They're there with probable cause to believe an aggravated assault occurred. They have the right to be there where they see the gun for the second time, really. Now it just comes down to actual circumstances, right? That would be the only remaining question. So talk about that. The police officers have thus far gone by the book, so to speak. They're allowed to be there. They can use their eyes to see a gun. What are they supposed to do at that moment? They're supposed to maybe have a... Say hello. Maybe talk to them a bit. I think that there would have been time for them to do some more investigation. My client, honestly, I think he could have slammed the door on them and just been like, sorry. So what are they supposed to do? They're supposed to get a warrant. They're supposed to underpay, and they're supposed to get a warrant. I mean, that's us. What a crazy thing. You need to have a warrant to enter a home unless you have adjusted circumstances. And I don't think when you're investigating this kind that's not a felony. What Peyton says is that you cannot effectuate a routine felony arrest without a warrant to enter someone's home to arrest them. For example, if a citizen stops somebody on the street or they get a complaint about an armed robbery and they say, you know what, I know the guy that robbed me. His name is Peter Jones, and he lives at this address. Okay? The police can't go there. They can't knock. I mean, they could knock on the door, but they cannot go there to make a routine felony arrest without an arrest warrant. So what do you think they should have done in that location when they're in the vestibule? The door is open. Yes. It's dark. They put a flashlight into the open space. And they actually have their weapons drawn. Right. What is it that you believe they were supposed to do? Well, I don't think we should reward them for, because my client dropped the gun for safety purposes. I don't think we should say, why don't we just take away the fourth amendment? I mean, the police are always going to be able to stop them. They should have gotten a warrant. They should have retreated and gotten a warrant. They should have waited there. They could have waited there. There are four officers there. This is the only entrance. They could have just stood there. Again, I don't think it's that different. Should they have had one of the officers leave and then go get an arrest warrant? I think the officer could have even done that when he was waiting on the curb. I mean, there's plenty of people here. Okay. Now, you said the officer that was waiting on the curb. He should have done that? Somebody could have done that. I'm just saying there's plenty of time. This guy didn't even know where he was going. Do you think they're going to cause them so that he could have secured that warrant? I don't believe that there's probable cause, no. He wouldn't get an arrest warrant because he didn't have probable cause. Right. All right. So, really, there's nothing they could or should have done. They can walk in. They can investigate. They can ask my client. Again, where is even just the police just knocking on the door and saying, hey, what happened there? I saw something there. I mean, you know what they're supposed to do? You're saying they're supposed to knock when the door is open? They're supposed to knock when they see a mother. They're not supposed to continue watching. The door now downstairs or where the steps are? Yeah. Okay. Where the apartment door was open. Yes. So, should they knock on that door? They can talk to them other than saying, police, what's going on? Why do you have to enter with guns on? I don't understand that. We can't presume someone's dangerous just because they have a gun. We can't presume that. The best that they can do is get gone in with their guns. I'm saying that they should have gone in, period. But the danger that was created was created by them. They created the emergency. They were the ones that came in, and if they didn't want to stop at the threshold, then they shouldn't have walked into the office. There's lots of things that they could have done. My client has no idea they're out there. This isn't nice. He isn't going anywhere. But let's go back to assuming that they have the right to be in the best view. The state has overcome all of your objections so far. They do have probable cause to be used in aggravated assault, and the best view is a common area that is okay to be in. I'm just trying to think from the viewpoint of the police. I understand what you're saying. Let's not reward them for their poor judgment. But if we concede for the purposes of argument that they've done everything right so far, how is this supposed to play out? So you're saying, based on Aguilar and based on Heller, that he has the right to have a gun in his home. That's, of course, true. And at that moment, they don't know that he's a felon or that he doesn't have an FOID card or anything else. But it's still a gun. Guns can still hurt people even if they have a constitutional right to it. They've now presented themselves to this guy. Could he, for example, what if they had stood there and he had, can they tell him to freeze? Can they tell him, don't move, don't reach for that gun? What if he bends over and picks up the gun? If he bends over and picks up the gun in a menacing way, looking to reach for the fire of the officers, then that's, I think, a different, that's a crime. That's an emergency situation if I'm pointing my gun at the officers. But if the guy with the flare, you know, he's obviously scared. This is a very volatile situation. Can I expect the police to kind of do something that's a little bit more calming? I'm just trying to figure out what that would be. Do you have your FOID card? Can I see your FOID card? Maybe ask them that. They could have brought him outside for an interview, right? They could have asked him. Okay, but what if he says, no, I'm not coming out? I'm just trying to get my own strong example. You know, we're not police officers, right? We're not judges and lawyers trying to tell cops what to do. So I want to make sure that, you know, we're not doing something. I think the proper thing to do in this circumstance, because, you know, we're new in Illinois to the fact that you can have a gun in your home. Right. And we're kind of, you know, let's show the police that this is protective conduct. I think the proper thing to do, and again, let's pretend that he didn't come in with gun blazing and just walked into the house like normal and saw him drop the gun and said, hey, may I want to talk to you? If that space right there is public space, then he comes out. Like, if that's just a normal police citizen encounter, then now I can talk to him. Do you have a FOID card? Do you have one on you? Those types of questions can happen. If he's in his house and, you know, they're going to take him out here and he refuses, he's allowed to shut the door. I think if the gun's drawn, is being blamed on him? Is the dropping of the gun a critical fact to you? What if he didn't drop the gun? What if he still had it under his shirt and they knew it and he knew it? I mean, that's a little scary to me, but I think if he would have just stood there with the gun in his waistband, I'm not sure what they would have done. I think they would have come in anyway. I mean... I think we're going to be seeing this a lot now. Right, right, exactly. He wouldn't have been in the doorway. If he would have been, maybe the door was open, but he was like, you know, five feet down the hallway. They didn't even know at this point it was actually him. I mean, there was another man and we don't even know. They didn't even know what apartment to look in. I mean, one of the factors for exigent circumstances, we've got that list, right? The courts give us lists and we've got a list, and one of those was a suspect armed, which seems like an interesting thing in light of the new era that we're in now. Yes. Because you can be armed. But that doesn't mean it's not still dangerous to the police. You've got a guy who you think, again, hypothetically, if you overcome all your objections up until the vestibule, you've got a guy who's committed an aggravated assault. I don't remember a lot in the record about how he was acting, particularly aggressively. But, you know, this is someone who has maybe used his gun a little bit in a menacing way, brandishing it, something like that. I mean, a reasonable police officer might look at this guy and say, I don't know that I totally trust this guy. You know, I have some reason to be a little worried about how he's going to behave. Right. And it just seems like this is a tough spot for everybody to be in. Yes. I mean, I understand that this is kind of the beginning of it. What if you accept this idea that under Aguilar, that you can be fighting and screaming and yelling at someone out on steps, and that if you have a chrome handgun in your waistband, you can actually lift up your shirt and display that gun. If you think that Aguilar covers that scenario, I think I'd be able to accept what you're arguing. But I don't believe Aguilar actually is what this case hinges upon, nor do I believe Jardines or Burns actually apply here. My understanding of the situation is, what did they observe? What did the one officer observe on the steps? Did he observe something that appeared to be a crime? Can the police investigate? If they shouldn't have investigated under Aguilar, as you suggest and I say, I think you have a valid position. But the six or seven factors that are generally considered for extreme circumstances are whether there was a crime under investigation that was recently committed, whether there was any deliberate or unjustified delay during which time a warrant could have been obtained, whether a grave offense has occurred, whether or not there was a reasonable belief the suspect was armed, whether the officers were acting on a clear showing of probable cause, whether there was a likelihood the suspect would escape if not apprehended swiftly, and whether there was a strong belief the suspect was actually in the premises, and finally, whether the police made a peaceably, albeit non-consensual, entry into the home. Yes. Those are extant circumstances. But at the beginning, I asked you if you agreed with me that plain view does not hinge upon extant circumstances, apparently like the trial court, for instance. No. I mean, plain view can provide probable cause, but you still need extant circumstances. It's not. So you agree that it's extant circumstances in order to support a plain view. Yes. Recovery. Yes. All right. So a warrant. So one or the other. So the trial court, I didn't mean to say, you know, whatever. They got it wrong. You have to have a right of access to the object. Right. It could be extant circumstances. Yes. It could be a warrant. A consent. It could be consent. It could be a high pursuit. I mean, it could be a number of different things. That's not extant circumstances. But in the U.S. Supreme Court case, Texas v. Brown, the U.S. Supreme Court, that was after that Coolidge v. New Hampshire case. In that case, they discussed the three primary wrongs of the plain view exemption. Yes. In other words, viewing is never enough. Yes. There also has to be a belief that the object is the instrumentality of the crime. And then third, they have to be where they have a right to be. Yes. So do you believe that if the police have a right to be in the building, in the vestibule, that the plain view exemption would apply? I believe that if my client would have kicked a gun into the hallway, if we're saying that they could be in the hallway, then yes. Then the plain view exception would apply because it's in a public space. It's X, Y, Z. But it's not. It's in the house. All right. Just take the facts as they are. Yes. You know, that they're in the hallway now. You said it doesn't matter what the facts are. But taking the facts as they are, that he just has dropped a gun in front of them, and they're in this vestibule area, what would be your position as to what they're supposed to do? My position is that they can speak to him and ask him to come outside. You know, come out and talk to me. And he's allowed to say no at that point. I think that, again, I think the danger was brought on by the armed, and armed and I'm not, you know, they were obviously in a tense moment. But it's possible that if they would have brought him to the vestibule, my client would have dropped a gun if he would have saw them. He might have shut the door. They would have waited a couple more minutes to go ahead and shut it. And I think there's all these, again, facts that go around in this case. The police could have acted more reasonably. There were other things to do. If they were concerned about the woman, they didn't see the woman. If they were concerned about him being just armed, you know, well, no, that's not enough anymore. Just because he's armed with a gun in his home doesn't necessarily make him dangerous. But he didn't know they were there, and I think that's a critical point that's getting lost. But they didn't need to walk in at that moment. They could have actually had a conversation together. I'm not sure I understand his knowledge. He wouldn't have fled. He wouldn't have gone anywhere. He wouldn't have discarded anything. Police aren't acting on what he believes, are they? Well, they need to be. Are they acting on what an objectively reasonable person would do, not what he thinks about whether they saw or didn't? Well, we do, because we also make the argument that these are substances that can be discarded without having any subjective belief on what the client was going to discard or not discard. So we do also look at the circumstances. And when you look at this and say, this is a man who was in his house, he had no idea he was being pursued or he was being looked at, he was being watched, that there was some time to maybe have a conversation about what do we do next. So does reasonableness matter at all here? So let's assume for the moment that we can agree that they're in the vestibule and they have a right to be in the vestibule. They see him take the gun and toss it to the floor or however it gets there. And, you know, yes, he has the right to have the gun in his home, but they just witnessed what we believe might have been an ag assault. They come in presumably on that basis. Does reasonableness play any part in this? This is going really back to Justice Ellis' question about really what would have been reasonable for them to do. I believe that the reasonableness would have started at the front door. The front outside, I believe. The reasonableness could have been even if you could walk in to say, oh, here you are, I just witnessed something, and have a conversation without guns on. I understand that he's armed, but, again, I think that this is, if we were in Texas, we really wouldn't be talking about this. I was trying to find a, you know, because you're allowed to have a gun in your home and I can't provide the police with a necessary presumption that you are a dangerous person anymore. And this is going to be the beginning of the great new frontier about how we parse this kind of conduct out. What are the police supposed to do? I think it also comes down to he didn't really, you know, he did flash the gun, but he did lift up his shirt and, you know, flash the butt of the gun, but that's what the officers already saw. He didn't take it out. He didn't wave it at anyone or point at anyone. Was there any evidence they threatened the woman who was doing it? No. They were mutually swearing at each other. They continued to argue when she was walking down the street. She didn't, I mean, she walked quickly, but we were there. She was the one leaving and he was the one staying. Yes, we were there. Right. I don't know that anybody really knows that at the point that the officer is observing it. But, anyway, did you want to talk about the sentencing or did you want to add anything? You'll still have time. I would like to talk about the sentencing. I mean, I think that, you know, this type of conduct we're talking about, this is 17 years. Sentencing is at 85%. This is being, the term we use is banked. And when we're talking about conduct that became constitutionally protected, a 17-year sentence for a man in his 50s who essentially with the care that we have in Illinois and what we know about seniors aging out in the process, seems extremely punitive for something that was essentially either in their possessory sense, which is possessing a gun, or a crime of a victim, which would have been the assault. A woman who never even bothered to, you know, necessarily show any type of, you know, she's a victim of anything. So, I think the 17 years, I mean, that seems incredible for conduct that might have just boiled down to, because of the felon, I shouldn't have done it, but the conduct of the officer, I think, I think it's extreme. Thank you. Are there any other questions? We'll give you some time for questions. Thank you. Mr. Maltese. Good morning. Once again, Assistant State's Attorney Peter Maltese on behalf of the people. The circuit court correctly denied defendant's motion when the police properly and legally responded to the reasonable suspicion that defendant had committed an aggravated assault. The officers were involved in a stakeout. They weren't staking out for the assault, were they? No, they weren't. Was there any interaction between these officers and the individual who left the apartment, the female who left the apartment? Was there any interaction at all? There's nothing in record that these officers were able to contact her or whether or not there was any investigation subsequent. The facts of the case were that Officer Villaja was dropped off south of the site and the driver, Officer Olivares, went and met the other enforcement officers north of the site. Now, when the female left, she walked in the southbound direction. She didn't cross their path whatsoever, and these responsible officers made the judgment call to go and investigate the gun. In your brief, you say that in this case, the facts were a finding of exigency. First, Officer Villajas saw defendant brandish his gun during a heated argument with the female. As a result, the woman quickly fled. Is there anything in the record that really supports that statement in your brief? Yes. His description of what he saw, he saw an argument, and this argument was so intense that it made four policemen drop the state out, which did not involve the defendant. Did he testify at the motion to suppress? Did he disclose those facts? Yes. And did another officer testify at the motion to suppress? Yes. But is that the basis that the other officers dropped whatever they were doing in their surveillance? I thought they wanted to stick out for another issue, and I thought counsel just indicated that when Villaja called his fellow officers, he didn't indicate that he had just witnessed an assault. No, he didn't. I'm sorry, I didn't mean to interrupt. That's okay. His actions in... What exactly did he say? I believe he said something akin to an individual with a gun. I gave him a description. He saw a man with a gun. He gave a description on the steps of the location. Yes. What did he say at the motion to suppress? Do you recall? Regarding what he said on the radio? What he saw. Yes. He said his attention was drawn to a commotion across the street, and he placed his binoculars. He was able to see them. He couldn't hear exactly what they were saying, although he was able to make out swear words. They appeared to be in an argument. They appeared to be in an argument. She was going down the stairs and he was on the top of the stairs. Well, she was at the bottom of the stairs. What did he do? He walked to the edge of the stairs, flashed his gun by lifting his T-shirt, and she turned around and left in, I don't know if he said brisk or quickly, he indicated in a quick manner, although she continued to argue on her way southbound. So the evidence in the record will show that he testified that the female was actually face-to-face with the defendant when he showed the gun? Because you just said she turned around. So I'm trying to get a visual of what the female was doing on the staircase. I have to admit it's my recollection of reading the testimony. I don't have the exact quotes in front of me right now. There was an indication based on her actions that she walked away after the gun was flashed. There was no indication that she had her back in at the time. In fact, it wouldn't make much sense for him to lift it if she wasn't facing him. Are you aware of anything that permits anyone who even has an FOID card to walk down the street and lift up their shirt and display their weapon? Certainly not. Certainly not in the course of an argument. Are you aware of anything else that allows this kind of conduct? Whether you have a permit for a gun or not, you can go flashing your weapon to people on the street? No. I'm just curious. I'm not aware of anything that permits a permit-holding gun owner to lift up their shirt and display a chrome revolver on the street anytime they want simply because they have a permit. I'm not aware of that. I'm just curious if you are. And there's absolutely nothing in this defendant's actions that would indicate lawful constitutional possession of a firearm. Is there anything that indicated unlawful constitutional possession of a firearm other than the fact that at one point he was standing on the steps and then he went into his home? Because once he goes into his home, we're in hell, right? So if you suggest the position that you take, then I want to understand how you support the opposite. Certainly him dropping the gun to the point that it slides into the living room shows a consciousness of guilt. It's certainly not consciousness. Are you suggesting that when the police officers enter into the vestibule, guns drawn, you drop a gun, that we can clearly conclude that this is guilt as opposed to I surrender? I mean, I'm not certain I... I'm not suggesting that this act by itself is enough to support a reasonable doubt by any stretch of imagination, but it is enough to support a reasonable suspicion that this is not... he's not exercising his constitutional rights. I mean, the defendant could have raised up his hands and had the officers seize the gun and then he could produce his FOB card and that would be consistent. Certainly not counsel. He could not have done anything safer than what he did. The actions that he took at that moment were the single safest thing that anybody could have done in that situation. He voluntarily disarmed himself and calmed everything down. He could have put his hands up, he could have walked away, he could have done a lot of things. I mean, I'm not saying the entire case relies on this, but suggesting that that's consciousness of guilt, four armed police officers identifying themselves as such have their guns pointed at you and you take your gun out and put it on the floor and say, okay, okay. And you're saying Matt Kruse is guilty? That he was doing something wrong? Again, proving would be a reasonable doubt issue, and I'm saying that it's enough to have the officers conclude that, hey, maybe this isn't a Second Amendment case. I think that a summary of Heller would have been helpful, but Heller did not involve a situation on the front suits of a building. Heller stands for the proposition that people have the right to bear arms in their home under the Second Amendment. Now, I'm a little curious, too, in addition to your opponent, you didn't supply us with any cases that involved the police being in a vestibule area of a home. You weren't able to find any in your research? Well, the people did cite people, the riots of 2010. That wasn't a lobby, but that was a back porch, which is sort of akin to a lobby. Well, Hunley was a back porch case. There the police observed a backpack being thrown from a window, but there's a case involving a gun called People v. Allen where the police observed a woman in a building and said that someone had just hit her with a gun or threatened her. There's a number of drug cases, People v. Garcia, People v. Perini, People v. Sasan, any of which could have shed a little light on the issue here, and that is if the police have the right to be where they are, can they seize things that they actually observe? Now, what is your understanding of plain view? Plain view is that an officer can seize an item under three conditions. Number one, the officer is legally located. Number two, the criminality of the item is apparent, and by apparent it doesn't mean apparent on the first glance, but it means that there's probably a cost. A police officer with common sense, everyday experience, could understand that a balloon filled with what looks like a lollipop could be a controlled substance. A probable cost to associate the item with criminal activity. And number three, that the item is in fact in plain view, that the officer didn't move things and suddenly it's in plain view. I thought the third step was that the officer then had lawful access to the object that he saw in plain view. That's correct. Is that the issue here? They have a right to be where they are so as to access something they first see, and then they have to be able to associate it or conclude it's the instrumentality of the crime. They have to actually be in a place where they have a right to be. Would we not have to first have exigent circumstances to get to plain view? No. Would this plain view just stand independent? The trial court was correct in that exigent circumstances was not required in order to see an item in plain view. Do you agree? I do. But there were not exigent circumstances. No, I don't agree with that. I do agree that exigent circumstances were not necessary. However, I do disagree that there were no exigent circumstances. There indeed were exigent circumstances, and as this court knows, this court could affirm on any record. But help me with this. So the first prong of plain view, they viewed it from a position where they had a right to be. They actually viewed the gun twice. They viewed it from the street. They had a right to be in the street. They viewed it from a vestibule, and your argument is they had the right to be there. Let's just assume that we agree with you on that, okay? So that's prong one. Prong two is it's immediately observed as contraband. Let's go to prong three, okay? So prong three says they have the right to gain access to that. So they may be in the vestibule, but the gun's not. The gun's in the house. They have to cross the threshold of the house to get into it. Do they have the lawful right, absent exigent circumstances, to make a warrantless arrest? Yes, and in this case, we concede it's not readily visible as contraband in light of the constitutional rights, but it is readily associated with criminal activity in light of what the first officer saw. Okay. And third prong, help me with third prong. How do they cross the threshold of the door? They have to – I understand Payden and New York v. Harrison, lots of cases from the U.S. Supreme Court, to say that you cannot make a warrantless arrest without probable cause and exigent circumstances. So if you don't have exigent circumstances, how do they have the right to cross the threshold of the door? To seize the item. But they don't have access to it. They don't have a lawful access to it unless they have exigent circumstances, right? What am I missing? Well, in this case, I agree there was exigent circumstances. But you need that, right? If you don't have that, then you lose, right? Well, I was – it's actually not, of course, because it's associated with criminal activity and – So that's the second prong. Tell me the third prong. You saw it from a position you had a right to be in. It's contraband or associated with criminal behavior. But you still have the – how do you cross the threshold of the door without exigent circumstances? Well, if it was obviously contraband, let's say narcotics, and the officer recognized it, the officer would be able to go in and get that. How? Why? Where do you get that from? Because it was viewed. It was viewed in plain view. We have a third prong. Tell me how you satisfy the third prong in that scenario. In fact, in a situation where there's not a complete extension of circumstances, there may, in fact, be some of the factors. And in this case, some of the factors are that the gun might not be there. You're arguing that it satisfied the test. There's a bunch of factors to consider. They're not exhaustive. They're not exclusive. But you're saying there weren't any circumstances. In this case, yes. What I'm asking you is, if there weren't, do you lose? Or do you have some other right? Did the police have some other right, absent exigent circumstances, to cross that threshold? Because if they do, I've never read a case that said so. Well, actually, if you take a look at Texas v. Brown, the United States Supreme Court actually talked about different exceptions to the warrant requirement and specifically laid out exigent circumstances based on a search warrant, hot pursuit, search of a person in their area immediately surrounding them, incident to arrest, and then they mentioned in Texas the so-called Plain View Doctrine. So actually, the Supreme Court of the United States has actually separated the Plain View Doctrine from exigent circumstances. And in Illinois, Justice Gordon, in People v. Garcia, pointed out that the third prong of Plain View could be supplied with exigent circumstances. So I've been trying to find out from either one of you whether you agree with this notion or not. There are certainly cases that say that in order to have the Plain View exception applied, there must be exigent circumstances. But again, there's First District cases that say exigent circumstances can supply the third prong. In other words, they have the right to be where they are in order to see what they're seeing. So if they don't have the right to be in the vestibule, it really doesn't matter what they see. But they have to have a right to be there in the first place. So if they were in the vestibule and had a right to be there and they observed something, I think they can act. I don't think they have to knock on the door. I don't think they have to call. I just don't think they have to let the gun sit there. But I'm not sure why either of you didn't cite any cases involving a situation. There are drug cases. There are gun cases. There are cases involving where the police are in a vestibule area of a multi-unit and couple-unit apartment building. And I mean, I don't quite understand why we don't have any discussions of those in either of the briefs. The police are actually in this case were reasonable, legal, and very responsible. It's a reasonableness test. Is that all it is, is reasonableness? So is that like consent, warrant, or reasonableness? Reasonableness certainly plays off on this. And certainly a reasonable suspicion that a crime has been committed allows the officers to go and talk to the person. But they didn't more than just go to talk to the person. They actually crossed thresholds into an individual's private home, which heretofore has been sacrificed, hasn't it? It has under certain exceptions with plain view and exigent circumstances. No, it doesn't. Let's talk about exigent circumstances. And I want to be clear. You believe there are or there are not. I believe in this case there are. And can you maybe suggest or help with at what point did the exigency arrive in this back pattern? When did it become exigent? It certainly evolved, but by the time the three officers were in the lobby where they had a legal right to be. So not until they got into the lobby were there exigent circumstances, not before? A certain number of factors were certainly present before that. At the point in time that in the close corners three officers are confronted with an odd man. No, they weren't confronted. The officers confronted him. I think you're flipping the script. So to get to the vestibule, we first have to have probable cause or not. Probable cause certainly would justify it, and we certainly argue that simply a reasonable suspicion under Terry would justify the actions of the officers. This was a commonly shared, unlocked area of an apartment building. And although it's described here as a vestibule, it's really a lobby. A vestibule would indicate something within the private residency, a receiving room within the private residency. This was not a vestibule. This was a lobby, a commonly shared lobby. It was like a two-story, a four-by-six vestibule. Isn't that how it was described? A small area going up to the second floor, and to the immediate left of the officers as they entered the building, there was the first floor apartment door, which was open at the time that they were in that vestibule. That's correct, and there's also a basement apartment, although there was no testimony on how that basement apartment was accessed. So you have a space that even taking defendant's description of the building situation, more than a half dozen people have access to it. And the fact of the matter is it's unlocked, and there's no testimony there's any type of doorknob and buzzard. The exhibit that's attached to defendant's brief does not clearly show one, and I have to just go by my recollection of when I reviewed the exhibit, but I don't recall seeing a doorknob, I mean a doorbell. And there certainly was no testimony that the doorbell was operable. The fact of the matter is there was a peephole. So first of all, when you consider, if I could direct a quote to the actual exhibit as opposed to the copy, on both sides of the door were transparent glass panels, which does not appear in the copy. The officers, with their most reasonable interpretation of the situation, were there at the common area, a common unlocked area. And counsel suggested that there was a list of tenants on there. Again, I don't see that on the copy, and I don't recall seeing it on the exhibit, but in any event that there was, that certainly shows that that area was a common area too. The officers in this case did no more than what the general public would do had they gone to visit the defendant or the tenant upstairs, and perhaps even the tenants in the basements. And the exigency was what again? The exigency was that they were confronted in an area with a man with a gun. No, that's after they get in. Oh, I'm sorry. So there was no exigent circumstances prior to them being in the vestibule or lobby, nothing? The exigency arose once they're in the lobby, and then I'm going to want to know how is it they're in that lobby and why are they in that lobby. Well, the exigent circumstances before they were in the lobby justifies why they didn't do what counsel suggested, wait there and go get a warrant. I mean, they observed what looked like to any reasonable person to be a domestic dispute. They didn't talk to the individual who was the other party to this alleged domestic dispute? There's no evidence that they did, no. And in fact, she went in the opposite direction where the officers did, and the officers made a professional, reasonable judgment to see what's happening with the man with the gun. Did they arrest him for aggravated assault? There's no evidence that he was arrested for aggravated assault, no. Did any of the officers at the suppression hearing or at trial, when they were talking about how these events unfolded, ever say they thought they had witnessed an aggravated assault? I don't recall them using those words at all. However, the way the officer described what he saw clearly fits the bill for that. And related to that, the mere fact that the officer did not say aggravated assault on the radio, that's not where offense is defined. He wasn't indicting the defendant at that point. He was merely directing his officers for what he seen and what needed to be heard. They just acted on what they heard over a radio. That's correct. I think the issue here boils down to are we going to write a decision that says that if a police officer observes what he thinks is an aggravated assault on the steps of a building in Chicago, that they do nothing, I guess. I mean, that's what we should write, that this Aguilar changes the entire landscape and that the police shouldn't really be doing anything here. They should have just, you know, gone home. That's certainly not the people's position. Well, maybe they should have stopped and talked to the woman who was leaving. Or maybe they should have gotten a warrant before they actually went into the vestibule. Yes, that's something they could have done. How about that? Could they have done that? No. Well, they could have, but they'd have to have established probable cause. Well, in this situation, the officers, they did not know exactly what they were viewing. There was certainly enough reasonable suspicion that they were viewing an aggravated assault. And what they did was they went to approach and see. People have arguments all the time, you know. People engage in, you know, this screaming kind of like back and forth all the time. You walk down the street today and see people screaming, and nobody does anything about that. And nobody calls it an aggravated assault. They just call it, or an assault, they just call it two people screaming at each other down the street. And they both go in different directions, which is what we have here, isn't it? So this woman is descending the steps, and she's walking away, and she's screaming, and he's screaming. And because he has a gun, and he shows the gun, obviously we get to aggravated assault, and we can get to probable cause there. Yes, the gun is the defining element. But we don't do anything about the gun. We know that he's going back and forth. We see him go back and forth with the gun, and the woman is leaving. Except what? That's it. And had the scenario been, as you described, two people fighting down the street, the officers probably would not have blown their cover in order to investigate. These officers were just going to find out what happened. They did not storm into a defendant's apartment as defendant items and items in the brief. They went to inquire what happened. Is there anything in the record that indicates that they actually investigated the assault? Were there any questions made to the defendant about the nature of the substance of the conversation or the heated discussion between the defendant and the alleged victim? Is there anything in the record? There's nothing in the record indicating that. Can you flat-footedly and absolutely say that they investigated the alleged aggravated assault? I could say that's exactly why they entered that building. To find out what happened, you said? To find out what happened. They saw what happened. What were they going to find out? When this oral argument began, I think the first sentence out of your mouth was, they went to go investigate the gun. Maybe that was a misspeak, but it sure looks like that's what they were concerned with, was the fact that he had a gun. My statement was they went under real suspicion of investigating the aggravated assault. In no way do we say that there was enough evidence for reasonable doubt for aggravated assault. But it was a situation that officers on the scene have to make a decision on what they're going to look at. What does the concealed carry law that we have now allow people to do? Carry concealed weapons, right? Yes. If you have a permit. Yes. I'm just wondering. I'm not aware of any statute that actually allows you to go out and display your weapon to the world. I'm not aware of it, but maybe I've missed something here. I wasn't aware that the concealed carry law allows people to do whatever they want with their gun once they're out on the street. And certainly if they're out on the street and they're involved in a heated argument and one of them lifts their shirt and shows a gun, I'm pretty sure that we could all agree that people would not be okay with such actions. And I want to be clear. We're not talking about on the street. The defendant never leaves the set, does he? No, he doesn't. All right. So he's on the top set or a set just outside of the lobby or the vestibule, however we want to define or characterize that. So he's not actually on the street. And I understand that neither Jardim or Jardines or Burns talk about being on the street or even being on the set. We're only talking about the curvilege which gets us to the lobby or the vestibule. That's what we're talking about. But I want to be clear. We're not talking about a defendant on the street, are we? We're talking about a defendant that lives on the street. From the street. From the street. And while we have no objection to the lobby being considered curvilege, the porch where he's at, that's not necessarily curvilege to his apartment because that's actually the entrance to the common space, the common, unlocked, fully visible space. Would that be consistent with Burns?  Burns said explicitly, this case is distinguishable from situations that involve police conduct in the common area readily accessible to the public. And so even under Burns, which as this court knows was just recently ruled upon by the Illinois Supreme Court, even under Burns the police action in this case would be totally proper and totally legal. So you would agree that had that door, that door that gave access to the lobby been locked, this would be Burns, or not? Well, if it was locked, of course, the officers would not have been able to get in. Would you agree that that would then be Burns? It would be Burns. Burns had a lot of other facts in the sense that Burns was a defendant. Burns was saying that you cannot take dogs, go sniffing around people's doors, inside, outside, around the home, and then go get a search warrant for drugs. That's what Burns is about, and that's what Jardim is about. That the police cannot go sniffing around doors with dogs to get evidence to then charge someone with a crime. That's what those cases are about. Exactly, and nothing in Burns says that an officer cannot... No, but Burns does say that that privilege includes the outer area of the home. And so in the sense that it says that, yes, you cannot invade that area with a dog sniffing around to go then get a warrant to search for contraband drugs in that home. And Burns was on the third floor. It doesn't matter. These cases stand for a very broad proposition regarding the securing of a search warrant for narcotics by the use in advance of dogs, canines, to go sniffing around people's doors to try to charge them with the offense of possession of drugs. That's what those cases are about. But they do have other principles that they state in regards to what a home really means. It isn't just the front door. It isn't just the hallway. It could actually be the outer portion of your home. You can't take dogs there and start sniffing around for marijuana. That's what those cases are about. And the people absolutely agree with you on that. This was not a Burns situation. This was a situation of the officers approaching the courtage of the defendant's house in the same way that any members of the public would have been able to do. Why did the trial judge say that he didn't think Aguilar had anything to do with this case? Do you recall what his findings were? Yes. He said that that was a Second Amendment case, and it was, in fact, the Second Amendment doesn't apply here. And although he did not use the words aggravated assault, he certainly was describing an aggravated assault. What about the sentence? Do you want to make any comments on that? Could I just ask one more question? Do you mind before we go to the action seat? The trial court found that there were no accident circumstances here, didn't he? That's right. Is he entitled to deference on that finding? No, that's a signing of law, and this court reviews signings of law as de novo, and also this court can affirm any matter of record regardless if that's what the court rested on below. Regarding the sentence, this court could only overturn the sentence or modify it if there's an abuse of discretion. There was no abuse of discretion. Defendant got sentenced to the exact mid-range. Defendant is a four-time, every four times he was convicted. I thought the record demonstrated that he had two convictions, delivery of a controlled substance and then aggravated arson or arson, and that that went back to, like, the year 2005? I believe for purposes of- Unconventional offenders? For purposes of the element of defense for which he was convicted, the people put in two other- Weren't the most recent convictions, though, from 2005 and before that? Yes, and the trial court presumably took that into consideration when he didn't get anywhere near the maximum sentence. Additionally, the length of time in between all of his felonies were quite lengthy, too, and even though it certainly seems to be a pattern of this defendant to not get convictions for length of time and drum up, in any event, the court obviously took into consideration matters of mitigation, where the court did not give him anywhere near the sentence. How long would the maximum have been? 30 years. And he got 17. And that's- I'm sorry? And he got 17. And he got 17. And the minimum for murder, if you don't use a handgun, is 20, isn't it? That's correct. And he got 17. He got 17, but he's also bringing in four priors. In addition to during the sentencing hearing, while the assistant state's attorney was specifying his past, the state's attorney put on record that the defendant was actually giggling when the aggravated arson was being mentioned, and then the defendant piped in and mentioned, well, that was so long ago, and I didn't even cause the fire. Well, it was from 2005, wasn't it? It was in 2005, but, I mean, should the defendant be able to commit a felony every decade or so and not have that count in favor of anything over the minimum sentence? The court did not abuse its discretion. The court explicitly mentioned all the parts of all the factors of mitigation, and this court should affirm defendant's sentence. Additionally, this court should affirm the trial court's ruling that denied his motion for suppression of the evidence and defendant's conviction should be affirmed. Thank you. Lambros? Just briefly, Your Honor.  I do want to say that to have the state's version of plain view is essentially their abandonment argument, which they said that they dropped. But as long as you drop an item and it's contraband, you're allowed to enter wherever you want to, regardless if you have a right to enter there. And that's not what this court has said in the past. You need not just the plain view of the object, but you have to be able to lawfully access it, and here it was inside of his home. They also made a comment about that it must have been a reasonable suspicion. You can't terry staff someone in their home. Even if it only rose to the level of reasonable suspicion, you still can't come into the home to respond simply to terry staff. And if there's no further questions, this is court to reverse my client's conviction outright or reduce the sentence. Thank you. Thank you. Thank you both. The case is well-argued and well-briefed, and we'll take it under advice.